**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INCARCERATED ENTERTAINMENT, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No. 18-480-VAC-MPT |
| v. | ) |
| | ) |
| CNBC LLC, NBCUNIVERSAL MEDIA, LLC, | ) |
| KURTIS PRODUCTIONS, LTD., HULU, LLC, | ) |
| GOOGLE LLC, APPLE INC., and | ) |
| AMAZON.COM, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS KURTIS PRODUCTIONS, LTD., NBCUNIVERSAL MEDIA, LLC, AND CNBC LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE LANHAM ACT CLAIM IN PLAINTIFF'S COMPLAINT**

Dated: June 18, 2018

Thomas E. Hanson, Jr., Esq. (#4102)
BARNES & THORNBURG LLP
1000 N. West Street, Suite 1500
Wilmington, DE 19801-1050
Phone: (302) 300-3447
Email: thanson@btlaw.com

Nathan Siegel, Esq. (*pro hac vice*)
Constance Pendleton, Esq. (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W. Suite 800
Washington, D.C. 20006
Phone: (202) 973-4200
Email: nathansiegel@dwt.com
        conniependleton@dwt.com

Taaj Reaves, Esq. (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Email: taajreaves@dwt.com

*Attorneys for Kurtis Productions, Ltd., CNBC LLC,*
*NBCUniversal Media, LLC, Amazon.com, Inc., and*
*Hulu, LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS ......................................................... 3

SUMMARY OF ARGUMENT ................................................................................. 4

FACTUAL BACKGROUND .................................................................................... 4

    A.    Plaintiff IE And Its Principal, Efraim Diveroli ............................................ 4

    B.    *The Real War Dogs* Documentary ............................................................... 5

    C.    The Challenged Promotional Materials ....................................................... 5

    D.    Plaintiff's Lanham Act Theory In Count XIV .............................................. 6

ARGUMENT ............................................................................................................ 7

I.    PLAINTIFF'S LANHAM ACT CLAIM FAILS TO STATE A CLAIM .............................. 8

    A.    The Specific Lanham Act Theory Alleged ................................................... 8

    B.    Count XIV Fails to State a Claim for False Advertising ............................ 10

        1.    Count XIV Fails to Allege the First Element of a False Advertising Claim ........................................................................... 11

        2.    Applying The False Advertising Prong of the Lanham Act Here Would Violate the First Amendment ....................................... 13

    C.    *Incarcerated Entertainment v. Warner Brothers* Was Wrongly Decided ........... 17

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................7

*Baraka v. McGreevey*,
481 F.3d 187 (3d Cir. 2007).....................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................7

*Boulé v. Hutton*,
328 F.3d 84 (2d Cir. 1993)......................................................................................14

*Brown v. Twentieth Century Fox Film Corp.*,
799 F. Supp. 166 (D.D.C. 1992), *aff'd*, 15 F.3d 1159 (D.C. Cir. 1994)................15

*Charles v. City of Los Angeles*,
697 F.3d 1146 (9th Cir. 2012) .....................................................................14, 17, 19

*Cher v. Forum Int'l Ltd.*,
692 F.2d 634, 638 (9th Cir. 1982) ...........................................................................15

*Conley v. Gibson*,
355 U.S. 41 (1957)....................................................................................................8

*CPC Int'l, Inc. v. Skippy, Inc.*,
214 F.3d 456 (4th Cir. 2000) ...................................................................................10

*Facenda v. N.F.L. Films, Inc.*,
542 F.3d 1007 (3d Cir. 2008)................................................................................8, 19

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ..............................................................................8, 14

*First Health Grp. Corp. v. BCE Emergis Corp.*,
269 F.3d 800 (7th Cir. 2001) ...................................................................................10

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
194 F.3d 505 (4th Cir. 1999) ...................................................................................16

*GOLO, LLC v. HighYa, LLC*,
No. CV 17-2714, 2018 WL 2086733 (E.D. Pa. May 4, 2018) .................................8

*Groden v. Random House, Inc.*,
61 F.3d 1045 (2d Cir. 1995)...........................................................*passim*

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1985)...........................................................16

*Incarcerated Entertainment LLC v. Warner Bros. Pictures*,
261 F. Supp. 3d 1220 (M.D. Fla. 2017)...................................18, 19, 20

*Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.*,
19 F.3d 125 (3d Cir. 1994)...........................................................9, 11, 12

*Joseph Burstyn v. Wilson*,
343 U.S. 495 (1952)...........................................................10

*Keel v. Axelrod*,
148 F. Supp. 3d 411 (E.D. Pa. 2015)...........................................................8

*Lane v. Random House, Inc.*,
985 F. Supp. 141 (D.D.C. 1995)...........................................................*passim*

*Lerman v. Flynt Distrib. Co.*,
789 F.2d 164 (2d Cir. 1986)...........................................................15

*Matthews v. Wozencraft*,
15 F.3d 432 (5th Cir. 1994)...........................................................15

*Miramax Films Corp. v. Columbia Pictures Entertainment, Inc.*,
996 F. Supp. 294 (S.D.N.Y. 1988)...........................................................16

*National Life Ins. Co. v. Phillips Publ'g, Inc.*,
793 F. Supp 627 (D. Md. 1992)...........................................................14

*New Jersey Payphone Ass'n v. Town of W. New York*,
299 F.3d 235 (3d Cir. 2002)...........................................................13

*New York Times v. Sullivan*,
376 U.S. 254 (1964)...........................................................2, 9, 10, 20

*Nichols v. Club for Growth Action*,
235 F. Supp. 3d 289 (D.D.C. 2017)...........................................................8

*Page v. Something Weird Video*,
960 F. Supp. 1438 (C.D. Cal. 1996)...........................................................15

*Parker v. Learn Skills Corp.*,
530 F. Supp. 2d 661 (D. Del. 2008)...........................................................8

iii

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989)..................................................................10, 19, 20

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014)..................................................................5

*Snyder v. Phelps*,
562 U.S. 443 (2011)..............................................................................16

*Time, Inc. v. Hill*,
385 U.S. 374 (1967)..............................................................................2

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
875 F.3d 1192 (9th Cir. 2017) ...........................................................19

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*,
898 F.2d 914 (3d Cir. 1990)................................................................9

*Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*,
683 F.3d 1266 (11th Cir. 2012) ..........................................................19

**State Cases**

*Lacoff v. Buena Vista Publishing*,
705 N.Y.S.2d 183 (N.Y. Sup. Ct. N.Y. Cty. 2000)..........................13, 18

*Montana v. San Jose Mercury News, Inc.*,
34 Cal. App. 4th 790 (1995) .............................................................15

*Namath v. Sports Illustrated*,
371 N.Y.S.2d 10 (N.Y. App. Div. 1st Dep't 1975), *aff'd*, 386 N.Y.S.2d 387
(N.Y. 1976) ........................................................................................15

**Constitutional Provisions**

U.S. Const. amend. I ...................................................................................... *passim*

**Federal Statutes**

15 U.S.C. § 1125(a) ....................................................................................... *passim*

15 U.S.C. § 1125(a)(1)(A) ............................................................................8

15 U.S.C. § 1125(a)(1)(B) ............................................................................8, 10

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ...........................................................1, 5, 7, 8

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Kurtis Productions, Ltd. ("Kurtis"), NBCUniversal Media, LLC ("NBCU"), and CNBC LLC ("CNBC") move to dismiss Count XIV of the Complaint, Plaintiff Incarcerated Entertainment, LLC's ("IE") Lanham Act claim, for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

This case arises out of a documentary about a widely-publicized example of war profiteering aired on the cable television network *CNBC* (the "Documentary"). The Documentary focuses on Efraim Diveroli, who became a significant defense contractor at a very young age during the Afghan War until he was charged and ultimately pled guilty to defrauding the U.S. Department of Defense. Plaintiff IE is a company Diveroli formed while still in prison, which claims ownership in Diveroli's "intellectual property."

The vast majority of the Complaint's 60 pages and 14 counts assert standard claims for copyright infringement. Plaintiff claims to own about a dozen photographs and video clips of Diveroli that appear in the Documentary, and alleges that their use infringed its copyrights. These Defendants are filing an Answer with respect to Plaintiffs' copyright claims, and any discovery the parties conduct related to those claims will concern relatively discrete issues germane to copyright disputes – such as copyright ownership, fair use, and the potential value of the photos and clips at issue.

But seemingly buried within the Complaint – toward the very beginning (¶¶ 14-20) and the very end (¶¶ 214-230) – is a claim of a very different nature. Plaintiff essentially alleges that Diveroli was really a patriotic citizen victimized by a wrongful prosecution, who pled guilty to a technical crime only because he felt he had no other realistic choice. Compl. ¶¶ 14-20. IE also alleges that Diveroli did not sell "bad ammunition" to the military and was not a "brazen con artist" who stole from American taxpayers. *Id.* ¶¶ 219, 221, 223, 225.

1

Taking those allegations at face value, one would assume that the "Plaintiff" was Diveroli himself, and that Count XIV alleges a cause of action for defamation. But that would be a difficult claim to establish, because, under the well-established First Amendment standards applicable to defamation, Diveroli would have the burden of proving that the Documentary was both false and broadcast with actual malice. And the potential scope of discovery relevant to such a claim would be enormously broad – ranging from how the Department of Defense procured arms for the Afghanistan war, to the quality of the arms Diveroli sold a decade ago, to how Defendants researched, produced, and aired an hour-long documentary.

But Diveroli is not the Plaintiff, nor does Count XIV plead a claim for defamation. Instead, Count XIV seeks to effect a transparent "end run" around the myriad barriers the First Amendment imposes on litigants who assert that a news story, book, television program, or other expressive work falsely depicts them. Rather than explicitly challenging the accuracy of the Documentary itself, IE purports to challenge the accuracy of advertisements which convey the very same information that the Documentary does. And since IE purports to only challenge the accuracy of the Documentary's "advertisements," Count XIV asserts a claim for false advertising under the Lanham Act, rather than defamation. And since the First Amendment standards of *New York Times v. Sullivan* and its progeny do not apply to the Lanham Act, IE seeks to litigate whether Diveroli sold "bad ammunition" while avoiding all of those constitutional standards.

If such a theory could even potentially survive a motion to dismiss, the chilling effect on the publication of books, documentaries, podcasts, and all manner of speech about historical persons and subjects would be staggering. Since most "books, newspapers, and magazines are published and sold for profit," *Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967), their publishers and producers necessarily advertise them. *Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C.

2

1995).  If Plaintiff's Lanham Act theory were potentially viable, then every retired politician who claims that his or her memoir is the only "true story" of their life could invoke the Lanham Act to sue all other biographers, historians, and documentarians and claim that marketing their books and documentaries as "nonfiction" is false advertising.  And the First Amendment would have nothing to say about whether or even how such disputes about historical truth may be litigated.

However, as other courts faced with similar false advertising theories about the accuracy of historical events have held, neither the Lanham Act nor the First Amendment may be so easily manipulated.  Where, as here, a plaintiff alleges that an advertisement for an expressive work is "false" because the historical facts contained in the underlying work are supposedly "false," as a matter of both statutory interpretation and First Amendment law no claim for violation of the Lanham Act is stated.  Indeed, more generally, only commercial speech is actionable as false advertising under the Lanham Act, and the law does not treat as commercial speech the incidental use of content from within expressive works to advertise the same works.

For these and other reasons set forth below, Count XIV of the Complaint should be dismissed with prejudice.  Moreover, dismissal of Count XIV now will enormously reduce the scope of any discovery going forward.

## NATURE AND STAGE OF PROCEEDINGS

On March 29, 2018, Plaintiff filed its Complaint against Kurtis, NBC, CNBC, as well as distributors of the documentary, Hulu, Amazon, Apple and Google, alleging one count of violation of the Lanham Act as against Kurtis, NBC, CNBC, and 13 counts of copyright infringement as against Hulu, Amazon, Apple and Google.  Today, all defendants are answering the copyright claims.

## SUMMARY OF ARGUMENT

Plaintiff fails to state a claim for false advertising under the Lanham Act, the only claim Plaintiff could assert based on the promotional materials for the documentary.  The Lanham Act must be narrowly construed when, as here, First Amendment values are implicated.  Count XIV fails to allege the first element of a false advertising claim – that the promotions were false or misleading.  And applying the False Advertising prong of the Lanham Act here would violate the First Amendment and the principle courts have long recognized that advertising summarizing an expressive work must be protected.

## FACTUAL BACKGROUND

### A.    Plaintiff IE And Its Principal, Efraim Diveroli

Plaintiff "IE" was formed in 2013 when its manager, Efraim Diveroli, was still serving a jail sentence for conspiracy.  Declaration of Constance Pendleton ("Pendleton Decl.") ¶ 2.  IE "owns the rights to Diveroli's life story and intellectual property."  Compl. ¶ 215.

When he was 18 years old, Diveroli launched a business, AEY, Inc., "specializing in arms, ammunition trading, and bidding on small United States Government defense contracts," which supplied "over 100 United States Government contracts for weapons and munitions."  Compl. ¶¶ 14-15.  In 2007, during the U.S. war in Afghanistan, the U.S. selected Diveroli's company to fulfill a "massive contract" to "arm[] the Afghan army (and its related police forces)" to fight the Taliban and Al Qaeda.  Compl. ¶ 16.  In 2008, however, the government suspended AEY's contracts based on claims that the company "violated pre-existing arms embargos."  Compl. ¶ 18.  The accusations included that certain ammunition, "none of which were defective," according to the Complaint, "supplied to the Afghans and the United States Army were sourced from China in violation of an embargo."  *Id*.  Diveroli was indicted on fraud charges and pled guilty to a count of conspiracy.  Compl. ¶¶ 18-19.  In 2011, he began serving a

48-month sentence in a Florida jail.  Compl. ¶ 20.  He was released in 2014.  Pendleton Decl.

¶ 3.

**B.**    *The Real War Dogs* **Documentary**

Plaintiff alleges that an episode titled "The Real 'War Dogs'" of *American Greed*, a cable

television documentary series produced by Defendant Kurtis Productions, Ltd. ("Kurtis") and

broadcast on CNBC, first aired on January 30, 2017.  Compl. ¶ 44.[1]  The Documentary begins by

noting that a recent movie, *War Dogs*, is only "loosely based on the true story of Efraim Diveroli

and David Packouz" and is "largely fiction."  By contrast, the Documentary says that it tells the

"real" story of "the real War Dogs" (2:40).  Among other things, the Documentary says that

some of the materials Diveroli sold to the military were "damaged" and "unacceptable" (0:40),

and interviews an expert who says that Diveroli was "getting rich off of selling bad ammunition

while people the same age as him are taking the sacrifices" (0:45).

**C.**    **The Challenged Promotional Materials**

Most of the Complaint alleges 13 claims for copyright infringement against seven

Defendants, based on various photos and video clips contained within the Documentary.  By

contrast, Count XIV does not purport to challenge the Documentary itself, and it is also only

asserted against Defendants NBCU, CNBC, and Kurtis.  Instead, it complains about two

---

[1]    The Documentary is attached as Ex. 1 to the Pendleton Declaration.  It is well-established that, on a Rule 12(b)(6) motion, a "document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks and citation omitted).

statements contained within three allegedly "promotional" materials, and invokes the Lanham Act.[2]

In the first statement, contained within two video clips, an expert interviewed claims that Diveroli got rich selling "bad ammunition" to the military, "while people the same age as him are taking the sacrifices.  Despicable!"  Compl. ¶ 220 and Ex. 2 to Pendleton Decl.  The comment is juxtaposed with an image of a soldier.  *Id*.  Both the expert's comments and the images in the two video clips are identical to the same comment and image contained within the Documentary itself.  Compare Ex. 1, 2, 3 to Pendleton Decl.  Plaintiff claims this statement is false because he did not sell any "faulty" ammunition.  Compl. ¶ 220.

Plaintiff also complains about a statement found on CNBC's website that is a part of an explanation for what the entire series *American Greed* is generally about (not specifically the Documentary).  The website explains that "*American Greed* takes you deep inside shocking true stories of brazen con artists who thrive on stealing fortunes, ruining and even taking lives."  Compl. ¶ 220 & Ex. N.  The Complaint alleges that viewers would understand from this statement that the particular episode about Diveroli "intended to" and "did depict the factually accurate story of Diveroli."  *Id.* ¶ 225.  The Complaint implicitly asserts that the Documentary supposedly was not a "factually accurate" account of Diveroli's life as a defense contractor, because only Diveroli's own memoir contains "the truth."  *Id.* ¶ 224.

## D.     Plaintiff's Lanham Act Theory In Count XIV

Count XIV alleges that IE owns the rights to Diveroli's life story and intellectual property.  *Id.* ¶ 215.  Diveroli wrote drafts of a manuscript entitled "Once a Gunrunner" about his

---

[2]     The promotional materials are attached as Exs. 2 and 3 to the Pendleton Declaration, and Defendants lodge with the Court DVD copies of the Documentary and video promotions with their motion.

experiences as a war profiteer.  *Id.* ¶ 216.  IE claims that in 2016 it was in discussions to create a documentary based on Diveroli's book and life story.  *Id.* ¶ 222.

But IE claims that viewers who want to learn about the real events in Diveroli's life would tune into the Documentary, since it was promoted as a "factually accurate story of Diveroli's life."  *Id.*  As a result, IE alleges that viewers who want to learn the truth will watch the Documentary rather than buy Diveroli's memoir or any other possible documentary.  *Id.* ¶¶ 223-224.  As a result, the Complaint alleges that Defendants' conduct constitutes "unfair competition" in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## ARGUMENT

To survive a motion to dismiss under Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible only if the plaintiff pleads "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  A court is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  Dismissal is appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Parker v. Learn Skills Corp.*, 530 F. Supp. 2d 661, 679 (D. Del. 2008).[3]

## I.   PLAINTIFF'S LANHAM ACT CLAIM FAILS TO STATE A CLAIM

**A.   The Specific Lanham Act Theory Alleged**

The Complaint alleges violations of the Lanham Act, 15 U.S.C. § 1125(a), claiming "unfair competition."  However, Section 43(a) of the Lanham Act authorizes two different categories of claims, and the Complaint fails to specify which prong of Section 43(a) it invokes. The first is a claim for trademark infringement/false endorsement, pursuant to 15 U.S.C. § 1125(a)(1)(A).  That prong of the Lanham Act arises where the plaintiff alleges that a defendant caused consumer confusion by falsely implying that the plaintiff endorsed, sponsored, or associated with the defendant's product.  *See, e.g.*, *Facenda v. N.F.L. Films, Inc*., 542 F.3d 1007, 1016 (3d Cir. 2008).  This prong is inapplicable here.  The Complaint does not allege that the three "advertisements" it targets implied that IE sponsored the Documentary.  Nor could it; to the contrary, the Complaint alleges that the promotions depicted Plaintiff's principal as a con artist who sold shoddy ammunition to the military.

The second prong of the Lanham Act authorizes claims for false advertising.  15 U.S.C. § 1125(a)(1)(B).  To state a claim a plaintiff must allege that: (1) the defendant made false or

---

[3] Courts dismiss Lanham Act claims on 12(b)(6) motions where alleged infringing works constitute "expressive" rather than commercial speech. See *Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013) (affirming dismissal under Rule 12(b)(6) of Lanham Act claim and holding that regardless of which provision of the Lanham Act applied, plaintiff's claim failed as a matter of law because it targeted core political speech rather than commercial speech); *Keel v. Axelrod*, 148 F. Supp. 3d 411 (E.D. Pa. 2015) (dismissing Lanham Act claim under Rule 12(b)(6) where political consultant failed to allege plausible facts suggesting that book passage, in which author allegedly falsely took credit for strategy devised by consultant, was written to promote author's own consulting services); *Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 298 (D.D.C. 2017) (dismissing Lanham Act claim under Rule 12(b)(6) where the advertisement at issue was similar to political speech "expressing a point of view" and not commercial speech promoting a good or service); *GOLO, LLC v. HighYa, LLC*, No. CV 17-2714, 2018 WL 2086733, at *4 (E.D. Pa. May 4, 2018) (dismissing Lanham Act claim under Rule 12(b)(6) where defendant's editorial reviews of weight loss dieting programs did not promote any competing product, or explicitly propose a commercial transaction, but simply offered an analysis of Plaintiff GOLO's product, and in doing so, do not go so far as to make any specific recommendations to consumers).

misleading statements as to its products, or those of the plaintiff; (2) there was actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales or loss of good will.  *Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc*., 19 F.3d 125, 129 (3d Cir. 1994); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914 (3d Cir. 1990).

If Count XIV purports to assert any theory under the Lanham Act, it could only be for false advertising.  Plaintiff essentially claims that (1) Defendants in the promotional materials falsely or misleadingly said that Diveroli sold "bad ammunition" and that the Documentary was the "true story" of his life; (2) people viewing those materials would think the Documentary was true when it is not; (3) they would be more likely to watch the Documentary as a result; (4) the Documentary is distributed in interstate commerce; and (5) people would be less likely to purchase Diveroli's memoir published by IE as a result.

If that theory really stated a claim under the Lanham Act, then almost anyone who disagrees with speech communicated by the media could assert such a cause of action.  For example, *The New York Times* famously promotes itself as "All the News That's Fit to Print." Anyone dissatisfied with a *Times* story about them could allege that the story was misleading, so the *Times* slogan violates the Lanham Act, because that particular report was not "fit to print." Even more broadly, virtually any disagreement among authors and commentators about anything could give rise to a false advertising suit.  For example, to this day, baseball fans and sportswriters passionately debate whether, when Babe Ruth hit a home run in the 1932 World Series, he actually "called his shot" by signaling to center field immediately before the pitch.  If

9

a publisher were to market a book as supposedly providing the definitive answer, under Plaintiff's theory, any other publisher with a book espousing a different theory could claim the promotion was false advertising that reduces the demand for their more "truthful" books.

**B.     Count XIV Fails to State a Claim for False Advertising**

However, that is not the law.  As a general matter, the Lanham Act must be "narrowly" construed when First Amendment values are at issue.[4]  And, as a threshold matter, Section 43(a)(1)(B) only applies to statements made in the context of "commercial advertising or promotion."  15 U.S.C. § 1125(a)(1)(B).  Thus, false advertising claims only potentially lie where the statement at issue is "commercial speech" under the First Amendment.  *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001).

Plaintiff unquestionably could not invoke the Lanham Act to explicitly challenge the accuracy of the Documentary itself, because documentaries like *The Real War Dogs* are indisputably noncommercial speech.  *See Joseph Burstyn v. Wilson*, 343 U.S. 495, 501 (1952).  As a result, the Documentary is protected by all the limits that the First Amendment and the common law impose on defamation and related tort claims.  For example, under *New York Times v. Sullivan*, 376 U.S. 254 (1964), and its progeny, a plaintiff would have the burden of proving that the Documentary contained provably false factual statements; that were specifically about (or "of and concerning") the plaintiff; and were made with fault (either negligence, or in the case of public figures actual malice).  Here, IE could not even satisfy one of the tort's threshold requirements, because the Documentary never mentions IE.

---

[4]     *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989); *CPC Int'l, Inc. v. Skippy, Inc.*, 214 F.3d 456, 462 (4th Cir. 2000) ("It is important that trademarks not be 'transformed from rights against unfair competition to rights to control language.") (citation omitted).

The false advertising prong of the Lanham Act, by contrast, only requires proof that an advertisement has a tendency to mislead and does not require that the ad be specifically directed at the plaintiff. *Johnson & Johnson–Merck Consumer Pharms. Co.*, 19 F.3d at 129. So what IE is trying to do is evade the requirements of the First Amendment by purporting to challenge only the accuracy of the promotions, not the Documentary. But that distinction is wholly ephemeral here, because the accuracy of an advertisement for a "true story" is entirely a function of whether the underlying *story* is actually true. The Complaint makes that obvious. For example, it alleges that the CNBC website's reference to "true stories" is false because the Documentary does not tell a true story; rather, only Diveroli's book allegedly does. Compl. ¶¶ 22-25. And the video promotions containing the allegedly false reference to "bad ammunition" merely replay the same interview excerpts contained within the Documentary.

IE is not the first plaintiff to invoke the false advertising prong of the Lanham Act to try to effect this sort of end-run around the First Amendment. Other courts faced with similar theories have rejected the proposition that advertisements for an expressive work like a book or documentary may be actionably "false" because the underlying content of the work is allegedly false – both as a matter of statutory interpretation and First Amendment law.

      1.    <u>Count XIV Fails to Allege the First Element of a False Advertising Claim</u>

The most significant case is *Groden v. Random House, Inc.*, 61 F.3d 1045, 1050-51 (2d Cir. 1995). *Groden* concerned an advertisement for a book about President Kennedy's assassination, in which the author purported to demonstrate that Lee Harvey Oswald was the lone assassin and debunk all conspiracy theories to the contrary. The advertisement contained the pictures of other authors who advocated various conspiracy theories under the headline: "Guilty of Misleading the American Public: '"One Man. One Gun. One Inescapable Conclusion."' *Id.* at 1051. One of the authors sued for false advertising on the theory that the

advertisement was false because more than one gunman was involved in the assassination.  *Id.* at 1052.

The Second Circuit held that the claim failed to satisfy the first statutory element of a Lanham Act claim, because the statement at issue did not assert anything false *about the publisher's book*.  It explained that:

> The Lanham Act does not prohibit false statements generally.  It prohibits only false or misleading descriptions or false or misleading representations of fact made about one's own or another's goods or services.

*Id.*  Thus, "[n]o matter what the true facts might be concerning the Kennedy assassination, the ad's statements said nothing false about Posner's book."  *Id.*  More broadly, *Groden* explained that, in assessing false advertisement claims "in this context . . . it is important to distinguish between advertising statements made to summarize an argument or opinion *within* a book and those made *about* a book as a product."  *Id.*  The Court suggested that only the latter might be potentially actionable, because otherwise "any attempt to apply the Lanham Act to appellees' ad would raise substantial free speech issues."  *Id.*

The same analysis requires dismissal of Count XIV in this case, because none of the alleged promotions make any "false or misleading statements as to [Defendants' Documentary] [or those of the plaintiff.]"  *Johnson & Johnson–Merck Consumer Pharms. Co.*, 19 F.3d at 129. With respect to Defendants' Documentary, the video clips accurately recount that an expert in the Documentary accuses Diveroli of selling "bad ammunition."  And the website description accurately reflects that the Documentary holds itself out to be the "real" story of Diveroli and Packouz.  Moreover, none of those materials say anything about Diveroli's memoir at all.  So whether Diveroli really did or did not sell shoddy material to the military has no more bearing on

the Lanham Act than does the question of who shot President Kennedy.  Defendants respectfully submit that *Groden* is well-reasoned and that Count XIV may, and perhaps should, be dismissed solely on statutory grounds, since courts are instructed to avoid unnecessarily reaching constitutional questions.  *New Jersey Payphone Ass'n v. Town of W. New York*, 299 F.3d 235, 248 (3d Cir. 2002).

>### 2.  Applying The False Advertising Prong of the Lanham Act Here Would Violate the First Amendment

However, other courts have reached the same results by applying First Amendment principles.  Recognizing that false advertising and analogous claims only potentially apply to commercial speech, many courts have held that for purposes of such claims, advertisements for expressive works must be treated no differently than the noncommercial works they advertise as long as they do not mispresent the nature of the underlying work.

For example, in *Lacoff v. Buena Vista Publishing*, 705 N.Y.S.2d 183 (N.Y. Sup. Ct. N.Y. Cty. 2000), the plaintiff alleged that the cover and ads for a book about an investment club were actionable false advertising under state law, because the book itself allegedly overhyped the actual results of the club's investments.  A New York trial court held the First Amendment barred that claim, because the ads merely re-stated the contents of the book.  Applying the same reasoning as *Groden*, the court held that "advertising that promotes noncommercial speech, such as a book, is accorded the same constitutional protection as the speech it advertises.  It is actionable only if it fails to accurately reflect the contents of the protected speech being promoted."  *Id.* at 190.

Likewise, in *Lane v. Randon House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995), a federal court considered another challenge by a different author to the same advertisement at issue in *Groden*, asserted on right of publicity grounds.  Applying *Groden*, the Court held that "advertising which

summarizes an argument or opinion contained in the book" must be protected as noncommercial speech in those circumstances. *Id.* at 152. More recently, the Ninth Circuit addressed the broader question of when advertisements for expressive works may be treated as commercial speech, and when they may not. *Charles v. City of Los Angeles*, 697 F.3d 1146 (9th Cir. 2012). Citing *Groden*, *Charles* noted that, "[t]o protect the ability of speakers to promote their work, the 'incidental use' exception to general commercial speech principles has also been extended to actions for false advertising, where advertisements that accurately reprinted false claims contained in the advertised works were protected from tort liability to the same degree as the underlying works." *Id.* at 1154. *See also Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013) (affirming dismissal of Lanham Act false advertising claim as applied to blog posts alleged to commercially compete with the plaintiffs' publications); *Boulé v. Hutton*, 328 F.3d 84, 91 (2d Cir. 1993) ("statements by [defendants that were quoted] in *ARTnews* contribute to reporters' discussion of an issue of public importance and occur in a forum that has traditionally been granted full protection under the First Amendment," even if they also serve a promotional purpose).

Indeed, there is a long line of cases recognizing and applying the same principles to hold that other tort theories such as the right of publicity may not target advertisements that merely summarize or republish content from the underlying expressive work they promote. In that context, the ads are protected to the same extent as the underlying work. *See*, *e.g.*, *Lane*, 985 F. Supp. at 152 ("The critical question is whether the promotional material relates to a speech product that is itself protected."); *National Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp 627, 644-45 (D. Md. 1992) ("[T]he statements in the promotional materials are not commercial speech and should not receive any different treatment than the other statements contained in

14

Defendants' publications."); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 797 (1995).

Here, the use of Diveroli's name, likeness, and story in the Promotion for the Documentary is exactly the kind of incidental use that courts have long allowed. *See Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994); *Lane*, 985 F. Supp. at 147-48.[5]   Indeed, courts have held that the "'incidental use' exception implements, and might even be required by, First Amendment considerations," *Groden*, 61 F.3d at 1050, because it is a necessary corollary to the media's right to publish expressive works in the first instance. *See Lane*, 985 F. Supp. at 147 ("It would be illogical to allow respondents to exhibit [speech products] but effectively preclude advance discussion or promotion of their lawful enterprise.") (quoting *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 462 (Cal. 1979), advertisement for constitutionally protected docudrama is constitutionally protected as adjunct to the docudrama)); *Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166, 172 & n.9 (D.D.C. 1992) ("[S]ince defendants had the right to use the clip in the film, they certainly had the right to use that scene [of James Brown performing] from the film in promotional activities."), *aff'd*, 15 F.3d 1159 (D.C. Cir. 1994); *Lane*, 985 F. Supp. at 147 (citing Restatement (Second) of Torts § 652C, cmt. d (1977))

---

[5]      *See also Lerman v. Flynt Distrib. Co.*, 789 F.2d 164 (2d Cir. 1986) (republication of magazine cover in advertisement for magazine held to be "incidental use"); *Cher v. Forum Int 'l Ltd.*, 692 F.2d 634, 638 (9th Cir. 1982) (holding that Forum magazine did not misappropriate actress and singer Cher's likeness when it used her picture in advertisements for contents of its publication, an interview with Cher that it was to publish in its magazine); *Page v. Something Weird Video*, 960 F. Supp. 1438 (C.D. Cal. 1996) (where defendants' videos are protected by First Amendment, advertising demonstrating quality and content of videos is also protected); *Namath v. Sports Illustrated*, 371 N.Y.S.2d 10, 11-12 (N.Y. App. Div. 1st Dep't 1975) (use of sport's figure's photograph to solicit magazine subscriptions was protected incidental use where photograph gave reader indication of contents of magazine), *aff'd*, 386 N.Y.S.2d 387 (N.Y. 1976).

("The very nature of the incidental use privilege is to exclude certain material from the rubric of commercial speech.").

Applying the principles articulated in *Groden* as a matter of constitutional law is consistent with the broader principle that the First Amendment does not permit plaintiffs to sue over allegedly false content by invoking alternative legal theories, to try to avoid all the requirements the constitution imposes on defamation and related tort claims.  That principle derives from the Supreme Court's decision in *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1985), which held that, as a public figure, Jerry Falwell could not use the tort of intentional infliction of emotional distress to recover damages for a satirical advertisement.  The Supreme Court more recently extended that principle to private figures as well, in a case involving invasion of privacy claims.  *Snyder v. Phelps*, 562 U.S. 443 (2011).  In the lower courts, many decisions hold that when the gravamen of a claim is that the plaintiff was injured by false statements in a news report, book, TV program or movie, alternative legal theories may not be invoked to avoid First Amendment limitations on challenging allegedly false speech.  *See*, *e.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999) (torts of fraud, trespass, and breach of fiduciary duty may not be invoked to recover damages for an allegedly false television broadcast).

This is not to say that advertisements for expressive works may never be treated as commercial speech, even for purposes of a false advertising claim, as *Groden* itself provides.  For example, in *Miramax Films Corp. v. Columbia Pictures Entertainment, Inc.*, 996 F. Supp. 294 (S.D.N.Y. 1988), one movie studio sued another over its advertising campaign for the movie *Summer.*  The plaintiff studio alleged that the defendant's promotional campaign falsely implied that *Summer* was directed by Wes Craven (a well-known director of horror films at the time),

when it was not.  That kind of false advertising claim is likely cognizable under both the Lanham Act and the First Amendment because it involved a false statement about the movie, rather than a statement that accurately summarized facts or ideas expressed within the movie.  Likewise, *Charles* held that, while the First Amendment likely protects movie ads in the context of certain tort-like claims like false advertising and the right of publicity, it does not restrict the ability of municipalities to apply general commercial speech regulations, such as where billboards may be located, to signs that advertise television programs.  *Charles*, 697 F.3d at 1156.

This case, however, squarely presents an effort to misuse the Lanham Act to challenge the accuracy of a documentary about the conduct of a war that is highly critical of Plaintiff's principal.  Neither the Lanham Act itself nor the First Amendment permits that type of transparent end-run around core First Amendment principles applicable to speech about matters of public concern.  Count XIV should therefore be dismissed.

**C.** ***Incarcerated Entertainment v. Warner Brothers* Was Wrongly Decided**

When, in 2008, Diveroli was arrested and charged with defrauding the military, the case attracted considerable press coverage around the world.  So it is not surprising that it later became the subject of books and films.  However, since Diveroli's release from prison, IE has filed three separate federal lawsuits in an effort to capture all the profits anyone has allegedly made by creating expressive works.  Those include lawsuits against: the producers of the movie *War Dogs* (Warner Bros.), a journalist who published an article in the magazine *Rolling Stone* about the case and then later wrote a book titled *Arms and the Dudes* (Guy Lawson), the publisher of the book (Simon & Schuster), and the producers and telecasters of the Documentary (Kurtis and CNBC).  Diveroli has never appeared as a plaintiff in any of those cases to assert a claim for defamation, but IE has repeatedly alleged claims for false advertising.

Two of those three lawsuits were recently filed in this jurisdiction, and there seems little doubt as to why they have been filed.  Last year in IE's first lawsuit, *Incarcerated Entertainment LLC v. Warner Bros. Pictures*, 261 F. Supp. 3d 1220 (M.D. Fla. 2017), concerning the movie *War Dogs*, the court denied the movie studio's motion to dismiss false advertising claims alleging that "Warner grossed more than $85 million by promoting *War Dogs* as Diveroli's 'true story' when it was not the true story." *Id.* at 1225.  The case then settled late in 2017, and, within months, both this lawsuit and another against Simon & Schuster were filed in this jurisdiction.  Defendants respectfully submit that this Court should decline to follow the *Warner* decision, for any or all of the following reasons:

1.      In addressing the first element of a false advertising claim, *Warner* applied the wrong test.  The film itself began by saying that it was "based on a true story." *Id.* at 1232.  So as *Groden* and other cases cited herein illustrate, the pertinent question was whether promotions stating the same thing accurately represented what the film purported to be.  But *Warner* never considered that question at all.  Rather, it erroneously considered whether a false advertising claim was stated because the film itself was allegedly a false depiction of history. *Id.* at 1225.  Nor did *Warner* ever consider cases like *Groden, Lacoff, Lane*, and others that have specifically addressed how the Lanham Act relates to an allegation that an advertisement for an expressive work is false or misleading.

2.      *Warner*'s First Amendment analysis likewise never considered the point that whether an advertisement for an expressive work may be treated as "commercial speech" depends on the nature of the claim directed at the advertisement.  Rather, *Warner* only addressed the apparently blanket assertion by the defendants in that case that an advertisement for a movie may *never* be treated as commercial speech in any context.  *Warner* properly rejected that

18

overreach, *id.* at 1228, but it did not proceed to consider the only question that is dispositive in this context:  whether advertisements which merely restate a movie's claim to be true can be treated as commercial speech for purposes of a false advertising claim.  Nor did *Warner* consider any of the cases addressing that specific question.  Most notably, *Warner* cited the Ninth Circuit's *Charles* opinion only to support the broad proposition that movie advertisements are not inherently protected, noncommercial speech.  *Id.* at 1228.  But *Warner* ignored that *Charles* expressly pointed to claims for false advertising as one context in which such advertisements are protected speech.

   3. Otherwise, *Warner*'s First Amendment analysis treated all Lanham Act claims as one and the same, ignoring that the statute recognizes distinct false endorsement and false advertising theories which trigger quite different statutory elements and constitutional implications.  As a result, almost all of the cases the Court's First Amendment analysis relied on were false endorsement, not false advertising cases, such as *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1999), *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266 (11th Cir. 2012), and *Facenda*, 542 F.3d at 1016.  *See New Life Art* at 1229-30.  Most circuits (including this one) agree that the false endorsement prong of the Lanham Act can potentially apply directly to expressive works like movies (let alone to their advertisements), and most apply a very speech-protective balancing test first recognized by the Second Circuit in *Rogers* to weigh a First Amendment defense.  *See, e.g.*, *Twentieth Century Fox Television v. Empire Distrib., Inc*., 875 F.3d 1192 (9th Cir. 2017) (applying the *Rogers* test to dismiss a false endorsement claim directed at a television series and advertisements promoting the series).  None of those cases or the principles they articulate relate to false advertising claims, which can trigger even greater First Amendment concerns since they directly challenge speech as factually false.  As previously

noted, Count XIV (like the Lanham Act theory pled in *Warner*), does not and could not plausibly allege that consumers are likely to be confused that IE sponsored the CNBC Documentary.[6]

4.   Finally, *Warner* never considered that IE's false advertising theory was effectively an effort to challenge the accuracy of the movie itself, thus effecting an end-run around the strong barriers the First Amendment imposes on any theory seeking to claim that a movie is a false depiction of history.  Nor did *Warner* consider how its view of the law would open the door to virtually any author, historian, or even subject of news to invoke the Lanham Act to sue anyone with an opposing point of view.

Indeed, the circumstances presented here starkly illustrate why the Lanham Act theory asserted here should be swiftly dismissed, as a matter of law.  Like most people, IE's principal believes that only he really knows the "truth" about his own life.  And like many, he has even committed his version of the "truth" to writing in the form of a memoir.  However, other authors, journalists, and television and film producers clearly have a different take on what is really the "true story" of Diveroli's life as a "gunrunner."  Rather than compete in the marketplace of ideas, IE has set out to sue anyone who advertises a different version of the "truth."  That is not consistent with the First Amendment's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ."  *N.Y. Times*, 376 U.S. at 271.

## CONCLUSION

For the foregoing reasons, Defendants Kurtis, NBC, and CNBC respectfully request that Count XIV of the Complaint be dismissed, with prejudice.

---

[6] Nor could the facts alleged here pass First Amendment muster under the *Rogers* test.  Under this test, no Lanham Act violation for false endorsement is stated "unless the [use] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [use] explicitly misleads as to the source or the content of the work."  *Rogers*, 875 F.2d at 999.  Here, the use of Diveroli's picture in the advertisements is obviously relevant to the Documentary, and the ads do not state in any way, let alone explicitly, that Diveroli was the sponsor of the Documentary.

Dated:  June 18, 2018

Respectfully submitted,

BARNES & THORNBURG  LLP
/s/ *Thomas E. Hanson, Jr.*
Thomas E. Hanson, Jr., Esq. (#4102)
1000 N. West Street, Suite 1500
Wilmington, DE 19801-1050
Phone: (302) 300-3447
Fax: (302) 300-3456
Email: thanson@btlaw.com


Nathan Siegel, Esq. (*pro hac vice*)
Constance Pendleton, Esq. (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20006
Phone: (202) 973-4200
Fax: (202) 973-4499
Email: nathansiegel@dwt.com
        conniependleton@dwt.com

Taaj Reaves, Esq. (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8349
Email: taajreaves@dwt.com

*Attorneys for Kurtis Productions, Ltd, CNBC LLC,*
*NBCUniversal Media, LLC, Amazon.com, Inc., and Hulu,*
*LLC*